UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ARCHIE OVERTON, et al.,

        Plaintiffs,

    v.

UBER TECHNOLOGIES, INC., et al.,

        Defendants.

Case No. 18-cv-02166-EMC

**AMENDED ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS**

Docket Nos. 51, 59

       Plaintiffs Archie Overton and S. Patrick Mendel sue the California Public Utilities Commission ("CPUC") and CPUC Commissioners in their individual and official capacities (together, the "CPUC Defendants") for creating a licensing scheme for "Transportation Network Companies" (TNCs) which Plaintiffs allege is preempted by federal transportation law and violates their Fourteenth Amendment rights. Plaintiffs also sue Rasier-CA, LLC for "acting in concert with the Commissioners" to secure a TNC permit "to avoid and subvert" federal transportation laws. Finally, Plaintiffs sue Uber Technologies, Inc. and its subsidiaries Uber USA, LLC, Rasier-Ca, LLC, and unknown Doe Defendants (collectively, "Uber Defendants" or "Uber") under the Federal Motor Carrier Act ("FMCA"), 49 U.S.C. § 14102, and for state law causes of action for breach of contract, fraud and intentional deceit, negligent misrepresentation, constructive fraud, and negligent and intentional interference with contract and prospective economic advantage. The CPUC and Uber Defendants have filed separate motions to dismiss all claims with prejudice. For the reasons stated below, the Court **GRANTS** both motions and dismisses all claims with prejudice, except as stated below.[1]

---

[1] Plaintiffs' pending motion to stay proceedings pending the Ninth Circuit's review of their mandamus petition for review of the Court's order denying a preliminary injunction is **DENIED**

# I.    LEGAL CONTEXT

Three areas of federal and state regulation are essential to understanding Plaintiffs'

allegations: the Federal Motor Carrier Act (FMCA) and California's laws and regulations

pertaining to transportation charter-party carriers (TCPs) and Transportation Network Carriers

(TNCs).  Each is summarized below.

A.    Federal Motor Carrier Act (FMCA)

The Federal Motor Carrier Act (FMCA), 49 U.S.C. §§ 13102, *et seq.*, regulates

"transportation by motor carrier and the procurement of that transportation, to the extent that

passengers, property, or both, are transported by motor carrier—

> (1) between a place in—
> (A) a State and a place in another State;
> (B) a State and another place in the same State through
> another State;
> (C) the United States and a place in a territory or possession
> of the United States to the extent the transportation is in the United
> States;
> (D) the United States and another place in the United States
> through a foreign country to the extent the transportation is in the
> United States; or
> (E) the United States and a place in a foreign country to the
> extent the transportation is in the United States; and
>
> (2) in a reservation under the exclusive jurisdiction of the United
> States or on a public highway."

49 U.S.C. § 13501.  The regulatory reach of the FMCA thus essentially extends to motor carrier

transportation that crosses state or international boundaries.  The statute exempts several specific

forms of transportation that would otherwise fall with the FMCA's reach, 49 U.S.C. §§ 13502-

13506, but the main exemption relevant here is that related to "transportation of passengers by

motor vehicle incidental to transportation by aircraft."  49 U.S.C. § 13506(a)(8)(A) (hereinafter,

the "incidental-to-air exemption").  The U.S. Department of Transportation has construed motor

vehicle transportation to be "incidental to transportation by aircraft" when:

> (1) . . . it is confined to the transportation of passengers who have
> had or will have an immediately prior or immediately subsequent

---

as moot.  *See* Docket No. 78.  The Ninth Circuit has resolved the appeal.  *See* Docket No. 83
("Petitioners have not demonstrated that this case warrants the intervention of this court by means
of the extraordinary remedy of mandamus.").

movement by air and

> (2) . . . the zone within which motor transportation is incidental to transportation by aircraft [except as the Secretary otherwise determines] shall not exceed in size the area encompassed by a 25-mile radius of the boundary of the airport at which the passengers arrive or depart *and* by the boundaries of the commercial zones (as defined by the secretary) of any municipalities any part of whose commercial zones falls within the 25-mile radius of the pertinent airport.

49 C.F.R. § 372.117(a) (emphasis added). The FMCA does not purport to regulate motor carrier transportation that occurs entirely within the boundaries of a single state when such transportation is not part of a longer trip between two states or two countries (*i.e.*, one leg of a longer trip).

The FMCA defines two groups of regulated service providers: "brokers" and "motor carriers." A "motor carrier" is "a person providing motor vehicle transportation for compensation." *Id.* § 13102(14). A "broker" is a "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for transportation by motor carrier for compensation." 49 U.S.C. § 13102(2). The difference is, essentially, between those who provide the transportation service (motor carriers) and those who arrange it (brokers).

Plaintiffs assert that the FMCA requires brokers and motor carriers to register with the United States Department of Transportation (USDOT). In fact, the FMCA's registration requirements do not apply to *all* covered brokers and motor carriers, but only a subset. For example, only a "broker for transportation of *property*," 49 U.S.C. § 13904(a) (emphasis added), not of passengers, is required to register. Similarly, the FMCA requires registration of "a motor carrier using self-propelled vehicles the motor carrier owns, rents, or leases." *Id.* § 13902(a). To obtain registration, a broker or motor carrier must demonstrate various proficiencies and satisfy certain insurance requirements. *See* 49 U.S.C. § 13902(a)(1)(A)-(D) and § 13904(a)(1)-(2).

Although enforcement of the FMCA is generally handled by government agencies, *see* 49 U.S.C. §§ 14701-14703, the FMCA also creates two private rights of action. First, under Section 14704, "[a] person injured because a carrier or broker providing transportation or service subject to jurisdiction under chapter 135 does not obey an order of the Secretary or the Board, as

applicable, under this part, except an order for the payment of money, may bring a civil action to enforce that order under this subsection."  49 U.S.C. § 14704(a)(1); *see also id.* § 14704(a)(2) (permitting recovery of "damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part").  Second, Section 14707 provides that "[i]f a person provides transportation by motor vehicle or service in clear violation of [the statutory registration requirements], a person injured by the transportation or service may bring a civil action to enforce any such section."  49 U.S.C. § 14707(a).  Under Section 14707, the requirement for a "clear violation" is jurisdictional rather than a standard of proof.  *See Mercury Motor Exp., Inc. v. Brinke*, 475 F.2d 1086, 1093 (5th Cir. 1973) (quoting legislative history stating that the words "clear and patent" "are intended as a standard of jurisdiction rather than a measure of the required burden of proof and that the district courts of the United States should entertain only those actions under these sections, as amended, which involve clear and patent attempts to circumvent regulation in the areas involved"); *Tri-State Motor Transit Co. v. Int'l Transport, Inc.*, 479 F.2d 171, 175 (8th Cir. 1973) (quoting legislative history explaining that "[t]he language of the section is designed to make it clear that the courts would entertain only those suits which involve obvious attempts to circumvent operating regulation").  Plaintiffs' First Amended Complaint only asserts a cause of action against Uber under Section 14707, for failure to comply with registration requirements.

B.  California Regulation of TCPs and TNCs

  Separate from federal regulation under the FMCA, the California Public Utilities Commission (CPUC) regulates certain transportation services.  The two relevant services here relate to charter-party carriers (TCPs) and transportation network carriers (TNCs).

  TCPs are defined to mean "[e]very person engaged in the transportation of persons by motor vehicle for compensation, whether in common or contract carriage, over any public highway in this state.  Charter-party carrier of passengers includes any person, corporation, or other entity engaged in the provision of a hired driver service when a rented motor vehicle is being operated by a hired driver."  Cal. Pub. Util. Code § 5360.  TCPs must have a permit to provide transportation services with limited exceptions not relevant here.  *See* Cal. Pub. Util. Code § 5371. There are several species of TCP authorization, but the two relevant here are Class A and Class B

1    certificates: a Class A certificate has no "restrict[ions] as to point of origin or destination in the

2    state of California," Cal. Pub. Util. Code § 5371.1(a), while a Class B certificate only permits the

3    holder to "operate from a service area to be determined by the [CPUC]," but not to "encompass

4    more than a radius of 125 air miles from the home terminal," *id.* § 5371.2(a). The key

5    distinguishing characteristic of TCPs, as opposed to traditional taxis, is that the transportation

6    must be "prearranged" rather than hailed on the street. *Id.* §§ 5360.5, 5381.5(a).

7        The CPUC has statutory authority to charge TCPs an annual fee. *See* Cal. Pub. Util. Code

8    § 421(a). These are known as PUCTRA ("Public Utilities Commission Transportation

9    Reimbursement Account") fees and they are currently charged a quarter of one-percent of a TCP's

10   "gross intrastate operating revenue" (0.25%). *See*

11   http://www.cpuc.ca.gov/General.aspx?id=3764.[2] The CPUC does not purport to charge fees for

12   interstate operating revenues. A TCP license may be suspended for failure to pay the required

13   fees. *See* Cal. Pub. Util. Code § 5387.5.

14       In 2017, California enacted laws regulating "transportation network companies" (TNCs),

15   the new business model represented by Uber and similar companies. *See* Cal. Pub. Util. Code §§

16   5430, *et seq.* A TNC is "an organization, including, but not limited to, a corporation, limited

17   liability company, partnership, sole proprietor, or any other entity, operating in California that

18   provides prearranged transportation services for compensation using an online-enabled application

19   or platform to connect passengers with drivers using a personal vehicle." *Id.* § 5431(c). TNCs are

20   required to keep certain forms of insurance, *id.* § 5433, and run criminal background checks on

21   their drivers, *id.* § 5445.2. TNCs are considered a subset of TCPs. Under the TNC model,

22   individual drivers using their personal vehicles are not required to obtain separate TCP

23   authorization; the TNC's authorization acts as an umbrella.

24   C.   Recent CPUC Decisions Related to Uber

25       Shortly after the appearance of Uber and other ridesharing services, the California Public

26

27   ──────────────
     [2]  The Court takes judicial notice of the CPUC's website regarding current fee rates as the "record

28   of a state agency not subject to reasonable dispute." *City of Sausalito v. O'Neill*, 386 F.3d 1186,
     1223, n.2 (9th Cir. 2004).

Utilities Commission (CPUC) issued an "Order Instituting Rulemaking" on December 27, 2012. *See* Uber's Request for Judicial Notice ("RJN"), Ex. A. During the rulemaking process, the CPUC "entered into settlement agreements intended to ensure the public safety of both riders and drivers with Uber, Lyft, and SideCar, allowing the companies to operate." Uber's RJN, Ex. B at 1, n.2. The agreement permits Uber and other ridesharing companies to operate until the "issuance by the Commission of a final non-appealable decision in the Rulemaking." Uber's RJN, Ex. C at 3.

On April 27, 2018, the CPUC issued a proposed decision ("Proposed Decision"). FAC ¶¶ 116, 123. The Proposed Decision would require Uber Technologies, Inc. to register as a TCP and TNC. Uber concedes that the CPUC adopted the Proposed Decision on May 4, 2018. However, Uber intends to challenge the decision pursuant to the CPUC Rules of Practice and Procedure, and has also sought a stay of enforcement of the decision. See Uber's RJN, Ex. E. Thus, the May 4, 2018 adoption of the Proposed Decision does not appear to be the "final non-appealable decision in the Rulemaking" that would supersede the CPUC's December 2012 interim grant of operating authority to Uber. Prior to the Proposed Decision, Uber Technologies, Inc. was party to a settlement agreement with the CPUC which allowed Uber to connect passengers both with TCP-holding and non-TCP-holding drivers subject to specified terms and conditions, pending a determination as to its status as a TNC and/or TCP. *See* Uber's RJN, Ex. C.

## II.     PLAINTIFFS' ALLEGATIONS

The gist of Plaintiffs' allegations is that they had a "thriving Black Car Livery business" until Uber appeared with a phone app allowing "passengers [to] sidestep [taxi] dispatchers and place their request[s] directly with drivers." First Amended Compl. ("FAC") at 3. Plaintiffs had a business as a TCP. In addition to their own customers, they also drove for Uber. Uber allegedly improperly influenced the CPUC to give it authority to provide services as a "Transportation Network Carrier" (TNC) throughout the state "with little consideration of Federal laws" in return for significant fees paid to the State of California. *Id.* at 4. Under California's TNC scheme, a TNC does not "operate vehicles or own a fleet" but rather "may operate, dispatch trips, from any point of origin to any destination in California." *Id.* TNC *drivers* are not required by California to

have commercial operating authority or commercial insurance; only the TNC service providers are. *Id.* According to Plaintiffs, Uber also violates California law by offering transportation services as a TCP or TNC without authorization and without paying the required PUCTRA fees. *Id.* ¶¶ 117-119.

Plaintiffs' CPUC licenses were suspended on April 6, 2018 allegedly because the CPUC claimed that Uber was not a licensed "Primary Carrier" and thus Plaintiffs were required to pay the unpaid fees and taxes. *Id.* ¶¶ 106, 108-109. Plaintiffs contend Uber should have paid the PUCTRA fees but did not do so because Uber was not yet classified by the CPUC as a TCP. The CPUC lifted the suspension on April 25, 2018 after Plaintiffs provided the CPUC with tax Form 1099's reflecting their gross fares earned through Uber. *Id.* ¶ 110.

Furthermore, Plaintiffs allege that Uber also meets the definition of a for-hire "motor carrier" under 49 U.S.C. § 13902, Compl. ¶ 53, but that Uber has not secured operating authority from the Federal Motor Carrier Safety Administration ("FMCSA"), *id.* ¶ 56. Uber allegedly falls within the FMCSA's jurisdiction because its drivers provide services between the United States and Mexico, between states, and transportation to or from airports that exceeds 25 miles and thus falls outside the incidental-to-air exemption. *Id.* ¶¶ 59-63.

Plaintiff Mendel specifically alleges that Uber once directed him to load a passenger with luggage from an airport for a destination more than 25 miles away from the airport, which he contends "exposed him to potential fines in excess of $25,000.00 and up to 1 year imprisonment for providing Uber's passenger with transportation in 'clear' violation of the federal regulations and laws requiring Federal motor carrier passengers operating authority." *Id.* ¶¶ 64-65. Indeed, Plaintiffs allege that they are "in constant fear of federal enforcement of fines in excess of $25,000 and imprisonment for up to 1 year." *Id.* ¶ 105. Yet, at the same time, Plaintiff complains that federal regulators have turned a blind eye to Uber because they are "woefully understaffed and underfunded." *Id.* ¶ 93. Plaintiff poses a rhetorical question: "Has anyone ever heard of a FMCSA Inspector questioning a livery or taxi vehicle on the street, even a police officer checking for federal operating authority . . . didn't think so . . ." *Id.*

Plaintiffs also allege that Uber, by arranging transportation services without federal or state

1  operating authority, has been unlawfully enriched by deducting service fees from individual Uber

2  drivers. *Id.* ¶¶ 101, 126. They seek disgorgement of those fees in excess of $82,000. *Id.*

3  Plaintiffs also claim that Uber's contracts contain unlawful arbitration clauses under the

4  Federal Arbitration Act because Plaintiffs are exempt "workers engaged in interstate commerce."

5  Compl. ¶¶ 134-142.

6  As relief, Plaintiffs seek: (1) an injunction barring the CPUC Commissioners from

7  enforcing the TNC permitting program which they contend is in conflict with the federal FMCA

8  registration requirements under 49 U.S.C. §§ 13901-13902; (2) an injunction forbidding Uber

9  from rendering any prearranged motor carrier transportation of passengers until they have secured

10  both federal operating authority and TCP operating authority under California state law; (3)

11  damages for Uber's breach of contract based on its failure to secure operating authority but

12  holding itself out as having such authority; (4) declaratory relief that Uber lacks proper licenses to

13  operate; (5) disgorgement of commissions unlawfully deducted from Plaintiffs' fares by Uber to

14  prevent unjust enrichment; (6) indemnification from any federal or state regulatory action; (7)

15  injunctive relief against unfair competition based on Uber's operation without lawful authority; (8)

16  damages under intentional and negligent infliction with contractual relations and prospective

17  economic advantage theories based on Uber's interference with Plaintiffs' relation to the CPUC

18  and their customers; and (9) damages premised on Uber's fraudulent misrepresentations that it had

19  lawful operating authority and has paid its PUCTRA fees.

20  ### III.    DISCUSSION

21  A.    Claims Against CPUC Defendants

22  Plaintiffs allege that CPUC's regulations creating a permitting-scheme for TNC drivers is

23  preempted by the FMCA, and also violate the interstate commerce clause and equal protection

24  clause. The CPUC Defendants argue that Plaintiffs lack standing to bring their preemption claim

25  and that they have not pleaded facts to support their commerce clause or equal protection claims.

26  1.    Federal Preemption Based on Fear of Prosecution

27  Plaintiffs' basic allegation is that Uber, its drivers, or both are subject to federal motor

28  carrier laws and thus must obtain licenses from the FMCA. *See* FAC at 27:5-10, 32:21-26.

Plaintiffs allege, however, that California's TNC laws conflict with and are preempted by these federal laws. *See* FAC at 59-66. Conflict preemption is the "implicit preemption of state law that occurs where 'there is an actual conflict between state and federal law.'" *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015) (citation omitted). It arises when "[1] compliance with both federal and state regulations is a physical impossibility, or [2] when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citations, quotations, and internal ellipses omitted).

Plaintiffs claim they have standing to bring this claim because California's TNC laws make it more likely that the FMSCA will prosecute them for providing interstate transportation subject to the FMCA without requisite authorization. Article III standing requires a plaintiff to show (1) "injury-in-fact" which is "concrete and particularized" and "actual or imminent," not "conjectural or hypothetical," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); (2) a causal relationship between the Plaintiffs' injury and Defendants' alleged wrongdoing, *id.*; and (3) the that the injury is "redress[able] by a favorable decision," *id.* at 561 (internal quotation marks omitted). Plaintiffs' theory of standing fails on all three counts.

First, Plaintiffs have not plausibly alleged a credible threat of harm to pursue declaratory and injunctive relief. Even assuming that Plaintiffs currently drive for a TNC, Plaintiffs have not cited a single example of the FMCSA ever requiring a TNC driver to obtain a federal license, prosecute one for failure to obtain one, or threaten any with prosecution or fines. Despite Plaintiffs' several requests that the FMCSA weigh in on this dispute, it has declined to do so. Indeed, Plaintiffs themselves emphasize that the FMCSA is understaffed and that FMCSCA enforcement against drivers is unheard of. *See* FAC at 40:11-17 ("Has anyone ever heard of a FMCSA Inspector questioning a livery or taxi vehicle on the street . . . didn't think so . . . ."). The mere existence of a federal regulation without some credible threat that it will be prosecuted against Plaintiffs is insufficient to meet Article III's requirements. *See Anchorage Equal Rights Comm'n*, 220 F.3d at 1139 ("[N]either the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement."); *see also Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (standing for "pre-enforcement review"

of a law is permitted only "under circumstances that render the threatened enforcement sufficiently imminent" rather than "chimerical"). Plaintiffs have not pointed to any indication that there is a specific credible threat of prosecution. *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (courts consider "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute" (quotation omitted)). Indeed, any threat of prosecution seems particularly remote here because Plaintiffs (a) concede that they do not provide services through their independent TCP business that would subject them to FMCA jurisdiction; and (b) out of the thousands of rides they have been directed by Uber to provide in their capacity as TNC drivers, Plaintiffs have only identified a handful of examples of rides that they contend is within the FMCA's jurisdiction.

Second, even assuming that Plaintiffs could allege a credible threat of prosecution by the *federal* government based on *federal* law, Plaintiffs cannot show that the CPUC is responsible for that harm. The CPUC does not enforce federal law and Plaintiffs made no allegations that prove the CPUC rules make it more likely that the federal government will take enforcement action against them. Nor have Plaintiffs shown that "it is impossible to comply with both federal and state law," *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016), such that a risk of prosecution under federal law arises from mere compliance with state law. Indeed, California law does not preclude a TNC driver from applying for and obtaining FMCA registration; drivers are free to comply fully with both regimes.

At the hearing, Plaintiffs argued for the first time that federal motor carriers must own or lease their vehicle, and thus the CPUC's TNC authorization for entities that do not own the vehicles conflicts with federal law. This argument fails for several reasons. As a preliminary matter, the federal statute cited by Plaintiffs does not require motor carriers to own or lease their vehicles. Rather, it merely provides that "[t]he Secretary may require a motor carrier providing transportation . . . that uses motor vehicles not owned by it to transport *property* under an arrangement with another party to – (1) make the arrangement in writing signed by the parties specifying its duration and the compensation to be paid by the motor carrier; [and] (2) carry a copy

of the arrangement in each motor vehicle to which it applies during the period the arrangement is in effect[.]" 49 U.S.C. § 14102. The purpose of these "truth-in-leasing regulations [is to] protect independent truckers from motor carriers' abusive leasing practices." *Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1211 (10th Cir. 2016). Section 14102 has no relevance here because it applies only to motor carriers transporting property (not passengers), and it does not contain an ownership requirement. It merely provides that when a vehicle that is not owned is used to transport property, certain documentation must exist and be carried in the vehicle. Nor do other provisions of the FMCA appear to contain an ownership or leasing requirement as Plaintiffs purport. Section 13902 merely requires motor carriers who "own[], rent[], or lease[]" their vehicles to register with the Secretary, but does not generally require all motor carriers to own, rent, or lease their vehicles. 49 U.S.C. § 13902(a)(1). In any case, even assuming that the FMCA required all motor carriers to own or lease their vehicles, California does not force any entity to violate federal law: rather, as the CPUC pointed out at the hearing, an entity that owns or leases its vehicles would merely be regulated as a TCP rather than a TNC. The CPUC regulatory scheme does not interfere with or impede enforcement of the FMCA. There is no basis for conflict preemption.

Third, Plaintiffs have not plausibly alleged that the relief they seek—invalidation of the TNC statute—would redress their alleged harm. They must allege that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Defenders of Wildlife*, 504 U.S. at 561 (quotation omitted). Whether or not California administers a TNC program, the federal licensing requirements would still exist. Thus, even if California is enjoined from administering a TNC licensing scheme, Plaintiffs would still be required to comply with federal law by obtaining an operating license from the federal government (if the law in fact requires them to do so), and would thus still face a threat of enforcement by their failure to do so. To the extent Plaintiffs argue that the TNC licensing scheme enables Uber to operate and expose its drivers to the risk of violating the FMCA, *e.g.*, by transporting passengers across state lines, Plaintiffs are not compelled by state law to do so. They do not have to driver for Uber. They can refuse a ride that requires crossing state lines. Or they can register under the FMCA as a motor

carrier.

For these reasons, Plaintiffs lack Article III standing to raise a federal preemption challenge to the TNC statute based on their unfounded fear that federal authorities will prosecute them. Further, their pre-emption argument is meritless. The pre-emption theory is **DISMISSED** with prejudice, because amendment would be futile; in their proposed Second Amended Complaint ("SAC"), Plaintiffs merely confirm that enforcement by the FMCSA is not credibly imminent. *See* SAC ¶ 180 ("Apparently it is the official policy of the FMCSA NOT to themselves enforce the federal registration requirements for 'clear' violations . . .").

2.  Federal Preemption Based on PUCTRA Fees

At the hearing, Plaintiffs proposed another theory of preemption for the first time. They claimed that California's PUCTRA fees taken from TCP drivers are preempted by the FMCA because TCP drivers engage in interstate commerce. The FMCA provides that "[a] State or political subdivision thereof may not collect or levy a tax, fee, head charge, or other change on – (1) a passenger traveling in interstate commerce by motor carrier; (2) the transportation of a passenger traveling in interstate commerce by motor carrier; (3) the sale of passenger transportation in interstate commerce by motor carrier; or (4) the gross receipts derived from such transportation." 49 U.S.C. § 14905. If there is preemption here, it would appear to be express.

Plaintiffs seem to assume that the phrase "in interstate commerce" as used in Section 14905 has the broadest possible interpretation with respect to all activities that Congress has the power to regulate under the commerce clause. *See U.S. v. Morrison*, 529 U.S. 598, 608-609 (2000) (explaining that the "three broad categories of activity that Congress may regulate under its commerce power" include "the use of the channels of interstate commerce," "the instrumentalities of interstate commerce, or persons or things in interstate commerce," and "activities that substantially affect interstate commerce" (quotation added)). That is not the case. The Supreme Court has "drawn a sharp distinction between activities in the flow of interstate commerce and intrastate activities that affect interstate commerce." *U.S. v. Am. Bldg. Maintenance Indus.*, 422 U.S. 271, 280 (1975). For example, the use of the term "engaged in commerce" in a statute, rather than the broader term "affecting commerce," has been held to be a "term of art, indicating a

limited assertion of federal jurisdiction," rather than an exercise of Congress's full authority under the commerce clause. *Id.* Here, there is no reason to think that Congress intended to exercise the full scope of its constitutional commerce clause authority when it enacted Section 14505 of the FMCA. To the contrary, the FMCA suggests that Congress self-consciously and deliberately chose to assert federal jurisdiction in a limited fashion: it expressly limited the FMCA's scope to transportation that at some point physically crosses state lines or international borders, *see* 49 U.S.C. § 13501, not any transportation which could conceivably "affect" interstate commerce. Moreover, even the reach of the FMCA is limited by substantial exemptions.[3] Those exemptions provide a clear indication that Congress did *not* intend the FMCA to cover all transportation that conceivably falls within the scope of Congress's constitutional commerce clause power.

Here, there is at most a question whether one intrastate leg of an interstate trip falls within the FMCA's reach, even when each leg is separately arranged. Plaintiffs specifically assert the example of taking a passenger to or from an airport beyond a 25-mile radius so that the passenger can then take an interstate flight. *See* 49 U.S.C. § 13506(a)(8)(A) (exempting "transportation of passengers by motor vehicle incidental to transportation by aircraft"); 49 C.F.R. § 372.117(a) (interpreting exemption to be "confined to the transportation of passengers who have had or will have an immediately prior or immediately subsequent movement by air" within a 25-mile radius of the airport and any contiguous commercial zones). The FMCSA (the agency enforcing the FMCA) explains that "[i]f a trip starts in one State and ends in another and the travel uses multiple modes of transportation . . . , every part of the trip is considered interstate commerce *if the entire*

---

[3] *See, e.g.*, 49 U.S.C. § 13503 (exempting jurisdiction over motor vehicle transportation provided in a terminal area where the transportation is a transfer, collection, or delivery; is provided by a rail or water carrier or freight forwarded; and is incidental to the carrier or freight forwarder's services); 49 U.S.C. § 13504 (exempting transportation operating solely within the State of Hawaii); 49 U.S.C. § 13505 (exempting transportation by a person engaged in non-transportation business for the furtherance of that primary business); 49 U.S.C. § 13506(a)(1)-(7) (exempting, inter alia, motor vehicles transporting school children, taxicab services, hotel shuttles, certain vehicles used for farming and agricultural purposes, newspaper distribution vehicles); 49 U.S.C. § 13506(a)(8)(A) (exempting transportation of passengers by vehicle incidental to transportation by aircraft); 49 U.S.C. § 13506(b) (exempting transportation provided entirely in a municipality, in contiguous municipalities, or in a zone adjacent to and commercially part of the municipalities, with certain special requirements for transportation across state lines to also possess state authorization).

*trip is prearranged.*"  Federal Motor Carrier Safety Administration, U.S. Department of Transportation, *Multi-Modal Passenger Transportation: Tips for Buses and Vans That Transport Passengers to and From Airports, Train Stations, and Ship Ports*, available at https/www.fmcsa.dot.gov/regulations/multi-modal-passenger-transportation.[4]  The statement provides as an example:  "if a passenger did not make prior arrangements and obtains transportation after arriving at an airport, port, or train station, subsequent highway transportation is not a continuation of the trip and is not considered interstate commerce."  *Id.*

While the deference under *Chevron, U.S.A. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984) may not be warranted, the Court may rely on such informal statements to the extent they have the "power to persuade" under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  Here, the FMSCA's guidance is entirely consistent with the exemption under § 13506(a)(8)(A) of transportation "incidental" to transportation by aircraft.  To the extent Plaintiffs claim they paid PUCTRA fees on fares for rides to airports longer than 25 miles, they still fail to adequately allege pre-emption.  The exemption under 49 C.F.R. § 372.117(a) extends to commercial zones contiguous to the 25-mile radius, and Plaintiffs have not alleged they gave rides beyond such zones.  Moreover, even if Plaintiffs provided transportation covered by the FMCA (and not exempt), they have not alleged they were prevented by the CPUC from excluding *those* fares (as opposed to other intrastate fares) from their self-reported PUCTRA fee statements.

### 3.    Interstate Commerce Claim

Plaintiffs' First Amended Complaint also alleges that the TNC program violates the interstate commerce clause.  That clause is violated when state action "unjustifiably . . . discriminate[s] or burden[s] the interstate flow of articles of commerce."  *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 98 (1994)).  Plaintiffs' theory of discrimination and burden is unclear.  All that Plaintiffs allege is that some TNCs engage in interstate commerce by providing transportation across state lines.  But they have not explained

---

[4]  The Court takes judicial notice of this agency statement.  *See City of Sausalito*, 386 F.3d at 1223, n.2.

how that means that California's regulation of TNCs burdens, interferes with, or discriminates against interstate commerce. As this Court explained in another case, "the mere fact that TNCs *engage* in interstate commerce is not enough to establish *interference* with interstate commerce." *DeSoto Cab Co., Inc. v. Picker*, 196 F.Supp.3d 1107, 1114 (N.D. Cal. 2016) (emphasis in original). Just because the federal government may require a permit for a particular activity does not preclude the state from requiring similar permits, so long as there is no conflict or undue burden on interstate commerce—Plaintiffs do not plausibly allege any burden on interstate commerce. This claim is **DISMISSED** with prejudice; Plaintiffs' proposed amended complaint does not resolve this deficiency.

### 4. Equal Protection

Plaintiffs also conclusorily claim that the CPUC has violated the Fourteenth Amendment's equal protection clause, which "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). They do not allege that they have been treated differently from similarly situated persons. They cite no basis for any such claim.

In their proposed Second Amended Complaint, Plaintiffs allege that the TNC regulations do not satisfy strict scrutiny, *see* SAC at 138, but they have not alleged that the regulations are based on suspect classifications or that they burden fundamental rights so as to trigger strict scrutiny. *See Kahawaioloa v. Norton*, 386 F.3d 1271, 1277 (9th Cir. 2004). Here, the economic regulation, not based on a suspect classification, "must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). It is generally very difficult for a plaintiff to prevail under this deferential standard of review. *See Desoto CAB Co., Inc. v. Picker*, 228 F.Supp.3d 950, 959 (N.D. Cal. 2017) (holding that CPUC did not violate equal protection clause by treating taxicab companies and TNCs differently because "[i]n a street-hail situation, a passenger is (as a general matter) more likely to be in a vulnerable position compared to a passenger who prearranges a ride" so "there is a conceivable basis for a differential approach to regulation").

Not only is the FAC deficient, but Plaintiffs' proposed Second Amended Complaint does

15

nothing to resolve those deficiencies. They do not allege what the problematic classification is here, or why strict security would be triggered, or that there is no conceivable rational basis for the classification. The CPUC Defendants generously infer that perhaps Plaintiffs are alleging that "the Commission created two classes of transportation companies: those that must comply with federal law, like the Plaintiffs, and those that need not, like Uber," CPUC Reply at 7, but that interpretation is flawed because California's TNC scheme does not plausibly purport to exempt any person from federal law. Even if it did, whether federal law imposes obligations on any party—be it Uber, Plaintiffs, or other TNCs and motor carriers—is independent of whatever action the CPUC has taken. Thus, invalidation of the California legislature's TNC rules would not alter the scope of federal law or regulation. Plaintiffs' alleged injury is thus not redressable. Plaintiffs both lack standing and have failed to state a claim.

Because the proposed amendment is futile, the equal protection claim is **DISMISSED** with prejudice.

5.    Further Amendment Is Not Warranted For New Claims

Plaintiffs proposed three new claims for injunctive relief against the CPUC Defendants, but they are all futile so amendment is not warranted. The first proposed claim alleges Defendants violated the California Constitution, but that claim is barred by the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (holding that allowing a federal court to "instruct[] state officials on how to confirm their conduct to state law . . . conflicts directly with the principles of federalism that underlie the Eleventh Amendment"). The second claim alleges that the CPUC improperly suspended their licenses, but they were subsequently re-instated and they have not alleged any future adverse consequences. Thus, there is no injury to redress with an injunction. Third, Plaintiffs allege that the CPUC conspired with Uber to create the TNC classification to evade federal transportation laws but, as the CPUC points out, even if that is true, the California legislature subsequently passed laws ratifying the TNC classification, so any conspiratorial "taint" has been cured by legislation. Plaintiffs do not allege that the Legislature also conspired with Uber. Accordingly, amendment for the purpose of asserting these new claims against the CPUC Defendants will be **DENIED**.

16

1    In sum, all claims against the CPUC Defendants have been **DISMISSED** with prejudice.

2  B.    Claims Against Uber Defendants

3      1.    FMCA Claim

4    Plaintiffs allege that Uber is operating as a "motor carrier" under FMCA without

5  registration in violation of Section 14707.  Section 14707 provides that "[i]f a person provides

6  transportation by motor vehicle or service in clear violation of [statutory registration

7  requirements], a person injured by the transportation or service may bring a civil action to enforce

8  any such section."  49 U.S.C. § 14707(a).  Uber moves to dismiss on the basis that Plaintiffs' fear

9  of prosecution is unfounded and that they therefore lack standing, and because Uber is not a

10  "motor carrier."

11        a.    No Standing Based on Fear of Prosecution

12    As explained above, Plaintiffs' fear of prosecution is not concrete or imminent.  Indeed, it

13  appears very unlikely that Uber would dispatch Plaintiffs to provide a ride that arguably falls

14  under the FMCA's jurisdiction in light of the broad statutory and regulatory exemptions for points

15  entirely within the same state, 49 U.S.C. § 13501, for commercial zones such as major

16  metropolitan areas, 49 U.S.C. § 13506(b)(1)(A), 49 C.F.R. Part 372, and for incidental-to-air

17  travel within 25-mile radius of an airport (or commercial zones contiguous thereto) when the

18  entire trip (air *and* land) is pre-arranged, 49 C.F.R. Part 372.117(a) and Uber's RJN ISO Reply,

19  Ex. A.  Plaintiffs' FAC only alleged a single occasion in which they received a ride through Uber

20  that involved an airport pick-up to a destination outside of the 25-mile radius—but Plaintiffs fail to

21  allege that the destination there was also outside of an exempt commercial zone.  Even assuming

22  that it was, a single ride that *might* be covered by the FMCA out of a total of, for example, over

23  6,700 rides Plaintiff Mendel has provided in 4 years of driving, *see* Mendel Decl. ¶¶1-2, 6-7,

24  merely highlights how remote the possibility is that Uber will channel a ride that could give rise to

25  a ride arguably within the FMCA's jurisdiction, let alone one for which the FMSCA will threaten

26  to prosecute Plaintiffs.  Moreover, if the ride clearly requires transportation in interstate commerce

27  by crossing state boundaries, Plaintiffs can refuse.  Plaintiffs' potential harm from violating the

28  FMCA is highly speculative.

Plaintiffs ignore that Uber does not coerce them to provide rides without FMCA registration: they could avoid the problem by seeking and obtaining their own FMCA registration or simply by declining an Uber ride they know may bring them within federal jurisdiction.[5] Thus, to the extent Plaintiffs assert a fear of prosecution as the basis for standing, they fail to allege a credible, imminent harm.

### b. Standing Based on Other Injuries

That does not dispose of the issue, however. Just because Plaintiffs have no credible fear of prosecution does not mean that they may not pursue a Section 14707 claim, so long as they can show they have been "injured" by Uber's violation of the statutory registration requirements. *See* 49 U.S.C. § 14707(a).

What constitutes a cognizable injury for purposes of Section 14707(a) is not clear. Most cases appear to involve plaintiffs with FMCA authorization suing competitor defendants who lacked the authorization, alleging a form of competitive injury. *See Am. Int'l Driveaway v. Alexander*, 488 F.Supp. 808 (D. Haw. 1980) (where plaintiff motor carrier "ma[de] a prima facie showing that Defendants are competing with Plaintiff to Plaintiff's injury," it had standing to bring suit against a competitor allegedly operating a motor carrier service without registration); *Nationwide Auto Transporters, Inc. v. Morgan Driveaway, Inc.*, 459 F.Supp. 981 (S.D.N.Y. 1978) ("Since [plaintiff] is authorized by virtue of the interline to conduct the operations involved here and has provided evidence that it has been damaged by [defendant's unauthorized] activities, we believe that it has standing to sue under [the statute.]"); *Tri-State Motor Transit Co. v. H.J. Jeffries Truck Lines, Inc.*, 347 F.Supp. 864, 870 (W.D. Miss. 1972) ("There can be no question but that to

---

[5] The claim that Uber coerces them to violate safety regulations in violation of 49 C.F.R. § 390.6 fails for this reason. *See* 49 C.F.R. § 390.6(a) ("A motor carrier . . . may not coerce a driver of a commercial motor vehicle to operate such vehicle in violation of [various safety regulations]."). First, it does not apply to Plaintiffs because they do not allege they drive "commercial motor vehicles." 49 C.F.R. § 390.5 (defining "commercial motor vehicles" to be those which weigh more than 10,000 pounds, transport more than 8 passengers for compensation or 15 passengers without, or used to transport hazardous materials). Second, even if they were, the regulation only applies to "threats" or "the actual withholding of business, employment or work opportunities or the actual taking or permitting of any adverse employment action to punish a driver for refusing to engage in such operation." 49 C.F.R. § 390.6. The only coercion Plaintiffs allege is "attaching trip completion bonuses and total trip count completion bonuses," but those are incentives to drive, not coercion to do so. FAC ¶ 67.

some substantial extent plaintiffs have been injured by [defendant's] illegal diversion of transportation business which otherwise plaintiffs would have shared in some amount," and therefore they had standing as injured parties.). At least one court has suggested that the plaintiff *must* be a competitor with an FMCA permit to seek relief. *See Nationwide*, 459 F. Supp. at 984 (holding that a defendant seeking to counter-claim under Section 14707 could not "seek relief under this provision unless it is authorized by the ICC to conduct the operations in question").

Assuming one does not have to register under the FMCA to sue under § 14707(a), Plaintiffs allege Uber's non-compliance causes them competitive harm. According to Plaintiffs, because Uber or its drivers provide transportation services for which the FMCA requires registration and Uber or its drivers do *not* obtain that registration, their business costs are reduced, thus enabling them to charge lower fares. Those business costs include, *inter alia*, lower insurance liability limits. As a result, Uber allegedly obtains an unfair competitive advantage over Plaintiffs in their TCP business due to Uber's non-compliance with applicable laws and regulations. Although the theory seems hypothetically possible, Plaintiffs have not pled sufficient facts to support a plausible inference that they have suffered such competitive harm traceable to Uber's alleged non-compliance with the FMCA requirements in the market in which Plaintiffs participate.

As a preliminary matter, Plaintiffs concede that, in their independent TCP business, they do not provide rides that would subject them to FMCA registration requirements. Thus, Plaintiffs do not willingly compete, or seek to compete, in any market subject to the FMCA's jurisdiction (and Plaintiffs admit that they themselves lack FMCA authorization). Uber's alleged illegitimate activity, under Plaintiffs' theory, however, would only occur in markets subject to the FMCA's jurisdiction. Because Plaintiffs and Uber are competing in different markets (at least with respect to the FMCA licensing issue), Plaintiffs would have to plausibly allege that Uber's illegitimate operations in the FMCA markets allow Uber to be unfairly competitive in non-FMCA markets. Plaintiffs have not done so in their current complaint nor have they advanced a plausible theory showing an interrelationship between the two markets at the hearing.

Plaintiffs' assertion that Uber gained an unfair competitive advantage by not registering as

United States District Court
Northern District of California

a motor carrier under the FMCA is highly speculative. The main consequence of FMCA registration is the payment of an application fee, minimum insurance liability limits, and required compliance with certain safety educational requirements. *See* 49 U.S.C. § 13902(a)(1)(A) (requirements for registered motor carriers); 49 U.S.C. § 13904(a)(1)-(2) (requirements for registered brokers). However, even if Uber is required to meet those requirements with respect to rides falling under the FMCA's jurisdiction, it would not have to meet them with respect to *all* of its rides in *all* markets. *See* 49 U.S.C. § 31138 (expressly stating that minimum financial responsibility requirements for transporting passengers for compensation applies when transportation occurs "between a place in a State and—(A) a place in another State; (B) another place in the same State through a place outside of that State; or (C) a place outside the United States"). The "lower costs" theory thus would appear to impact only Uber's operations in the FMCA-regulated market, not the exempt non-FMCA markets.

Even if Uber had to register as a motor carrier as a result of some interstate transportation,[6] and applied those requirements to all its rides, including those which are purely intrastate, there are many variables pertaining to costs and market conditions that would affect any net advantage in Uber's pricing material to Plaintiffs' competitive position. It would be speculative to ascribe any particular pricing advantage simply to the failure to register under the FMCA. We do not know what Uber's increased costs would be if it registered, how those increased costs would be born as between Uber and its drivers, how much, if at all, Uber's pricing of rides will be affected, and whether any change in Uber's pricing will affect Plaintiffs' business. *Cf. Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458-59 (2006) (holding that plaintiffs failed to adequately allege a causal connection between reduced market prices and defendant's fraudulent activity because prices could be lowered "for any number of reasons unconnected to the asserted pattern of fraud," such as "a cash inflow from some other source or [its conclusion] that the additional sales would justify a smaller profit margin;" the "lowering of prices in no sense required [defendant] to defraud the state tax authority"); *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 982-983 (9th

---

[6] Plaintiffs conceded at the hearing that Uber need not register as a "broker" under § 49 U.S.C. 13904.

Cir. 2008) (holding that county could not sue employer who hired undocumented immigrants for alleged increase in law enforcement expenditures because "the asserted causal chain . . . is quite attenuated," "would be difficult to ascertain because there are numerous alternative causes that might be the actual source or sources of the [plaintiff's] alleged harm," and the "injury would be speculative in the extreme"). Notably, Plaintiffs themselves have not registered under the FMCA; that makes Uber's purported unfair advantage even more speculative.

In short, Plaintiffs have not plausibly alleged that they would be materially disadvantaged as a result of Uber's alleged non-compliance with FMCA registration requirements.

Nothing in Plaintiffs' SAC demonstrates they can overcome this deficiency. Furthermore, Plaintiffs' FMCA claim fails on the merits, as explained below.

### c. Merits

Even if Plaintiffs had plausibly alleged an "injury" that conferred them with standing, they have not plausibly alleged a "clear violation" by Uber, which is a jurisdictional pre-requisite to bringing suit under Section 14707. *See Mercury Motor*, 475 F.2d at 1093; *Tri-State Motor*, 479 F.2d at 175. First, Uber is not a "motor carrier" required to register under the statute, because the registration requirement only applies to motor carriers who "own[], rent[], or lease[]" their vehicles. *See* 49 U.S.C. § 13102(14) (a motor carrier is "a person providing motor vehicle transportation for compensation"); 49 U.S.C. § 13902(a) (registration requirement applies to "a motor carrier using self-propelled vehicles the motor carrier owns, rents, or leases"). Second, although Uber is likely a "broker," *see* 49 U.S.C. § 13102(2) (defining "broker" as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise, as selling ,providing, or arranging for, transportation by motor carrier for compensation"), not all brokers are required to register; rather, the FMCA registration requirement only applies to "a broker for transportation of property." 49 U.S.C. § 13904(a). Plaintiffs do not allege that Uber transports property; they allege it transports people. Thus, Plaintiffs have not alleged a "clear violation" of any of the FMCA's statutory registration requirements.

The "clear violation" allegations cannot be cured by further pleading. Accordingly,

Plaintiffs' Section 14707 FMCA claim against Uber is **DISMISSED** with prejudice.[7]

## C. Plaintiffs' California Law Claims Premised on Lack of Operating Authority

Plaintiffs' remaining claims for breach of contract, unjust enrichment, indemnification, violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, and fraud are all premised on the notion that Uber is operating as a TCP without proper authority under California law, and/or a "motor carrier" or "broker" under federal law.[8]

### 1. Plaintiffs' Cannot Allege Uber's Unauthorized Operations

As explained above, with respect to the FMCA, even assuming that Uber is required to register as a "motor carrier," and even assuming that Plaintiffs could allege some form of competitive harm resulting from the failure to register, Plaintiffs have not established a "clear violation" of the FMCA because Uber is neither a "broker of transportation" required to register nor a "motor carrier" using a vehicle it owns, rents, or leases which is required to register. Thus, Plaintiffs have failed to allege both that Uber is violating the FMCA and that any damages are traceable to that violation.

With respect to California's TCP and TNC framework, Plaintiffs fail because the CPUC has clearly granted Uber interim operating authority until final non-appealable rules are issued. Uber's RJN, Ex. B at 1, n. 2 and Ex. C. Though the CPUC has since adopted a final rule, the appeals process has not yet been exhausted. The interim authorization to operate remains in effect. Plaintiffs' claims premised on the allegation that Uber unlawfully operates without

---

[7] Plaintiffs have only sought injunctive relief under the FMCA Section 14707. They did not bring a claim for damages under Section 14704(b), which provides that "[a] carrier or broken providing transportation or service subject to jurisdiction . . . is liable for damages sustained by a person as a result of an act or omission of that carrier or broken in violation of this part." 49 U.S.C. § 14704(b).

[8] *See* FAC ¶ 184 (alleging **breach of contract** because "Uber . . . fail[s] and refus[es] to take any steps necessary to fully and completely secure California and Federal transportation operating authority . . . and such failure . . . renders Uber's transportations activities unlawful"); *id.* ¶ 191 (alleging **unjust enrichment** because Uber deducted commissions from Plaintiffs' rides arranged through Uber despite lacking "the requisite State or federal operating authority"); *id.* ¶ 194 (requesting Uber **indemnify** them from state and federal regulatory action in light of Uber's lack of operating authority); *id.* ¶¶ 197 (alleging **UCL** violation because Uber "has never had authority to operate as a transportation provider under California and Federal law"); *id.* ¶ 223 (Uber **fraudulently** represented that it was "lawfully allowed to operate a passenger transportation company").

authorization under California law thus fail as well.

Even if the CPUC's interim authorization had since expired, the Court would likely lacks jurisdiction over Plaintiffs' claims. The California legislature has limited judicial review of CPUC actions. Section 1759 of the California Public Utilities Code provides that "[n]o court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, *or to enjoin, restrain, or interfere with the commission in the performance of its official duties*, as provided by law and the rules of court." Cal. Pub. Util. Code § 1759(a) (emphasis added). The California Supreme Court has established a test to determine whether an action is barred by § 1759. *See San Diego Gas & Elec. Co. v. Sup. Ct. ("Covalt")*, 13 Cal.4th 893, 923-35 (1996) (test requires considering (1) whether the CPUC has authority to adopt a policy on the subject, (2) whether it has exercised that authority, and, finally, (3) whether the court action "would hinder or interfere with that policy").

Recently, in *Goncharov v. Uber Tech., Inc.*, 19 Cal.App.5th 1157 (2018) the California Court of Appeals considered the scope of Section 1759 in connection with a challenge by taxicab drivers to Uber's alleged failure to comply with CPUC licensing requirements for TCPs—an argument that is nearly identical to Plaintiffs' here. When Uber sought to demur on the basis of Section 1759, the plaintiffs argued that Uber's liability as a TCP for past damages would not interfere with the CPUC's prospective regulatory authority. The Court of Appeals disagreed, holding that "[t]he CPUC's evaluation of whether Uber is a charter-party carrier and what regulations should apply" is "an express focus of the CPUC's formal Rulemaking regarding Uber and TNC's." *Id.* at 1171. Thus, "[a]ny determination regarding Uber's status would strike at the heart of this process," "would be directly related to [the CPUC's] ongoing efforts to regulate Uber and TNC's," and "[a] judicial ruling to the contrary could potentially undermine this process." *Id.*

Similarly, here, the CPUC's efforts to determine Uber's regulatory status and develop its rules is ongoing. Although the CPUC has voted to adopt a particular set of rules, the internal appeal and review process has not yet been completed. Furthermore, the CPUC has proposed sanctions Uber must pay for its past conduct in order to bring itself into compliance. Resolution

of Plaintiffs' claims would, as in *Goncharov*, require this Court "to make factual findings regarding whether Uber falls within the charter-party carrier definition and, if so, which regulations would apply to its operations," which would "directly infringe upon the CPUC's ongoing rulemaking in this area." *Id.* at 1174. Thus, this case does not fall into the limited class where Section 1759 "permits courts to entertain actions for both damages and injunctive relief against regulated entities where those actions seek to enforce, rather than challenge, obligations created by CPUC regulations." *North Star Gas Co. v. Pac. Gas & Elec. Co.*, Case No. 15-cv-02575-HSG, 2016 WL 5358590, at *13 (N.D. Cal. Sep. 26, 2016).

Accordingly, Plaintiffs' claims for breach of contract, unjust enrichment, indemnification, violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, and fraud are **DISMISSED** with prejudice.

### 2. Alternatively, These California Claims Also Fail for Other Reasons

The aforementioned California common law and statutory claims each fail for other reasons, too, as explained briefly below.

**Breach of contract:** Plaintiffs assert a breach because Uber failed to obtain requisite operating authority. However, the contract terms Plaintiffs cite in their complaint do not impose such a requirement on Uber; they only impose them on drivers like Plaintiffs. *See* FAC ¶¶ 87-88 (citing terms requiring that each driver maintain "all licenses, permits, approvals and authority applicable . . . that are necessary to provide passenger transportation services to third parties in the Territory"). Thus, there is no breach alleged. The claim is dismissed with prejudice because Plaintiffs fail to show amendment would not be futile.[9]

**Unjust Enrichment:** "[I]n California, there is not a standalone cause of action for 'unjust

---

[9] Plaintiffs' proposed Second Amended Complaint cites another provision from a 2014 agreement that states, "[f]ailure by either party to maintain all licenses and permits required by law and/or this Agreement is a material breach." SAC ¶ 339. But all this provides is that Plaintiff has the right to terminate the Agreement in case of the material breach. *See Brown v. Grimes*, 192 Cal.App.4th 265, 277 (2011) ("When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract."). It does not establish that Plaintiffs suffer damages from the breach. Moreover, Plaintiffs admit that the provision no longer exists in subsequent, superseding versions of the agreement to which Plaintiffs agreed. SAC ¶ 340.

enrichment,' which is synonymous with 'restitution.' […] When a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (citations omitted). However, "[a]n action based on quasi-contract cannot lie where a valid express contract covering the same subject matter exists between the parties." *Gerlinger v. Amazon.com, Inc.*, 311 F.Supp.2d 838, 856 (N.D. Cal. 2004). As Plaintiffs allege, the contract in question here covers the subject matter of fees that Uber may deduct, so the quasi-contract claim is precluded and dismissed with prejudice.

**Indemnification:** Plaintiffs seek indemnification against adverse regulatory action, but they have not shown that their past temporary suspension was caused by Uber nor have they shown any credible threat of future harm caused by Uber. In any event, Plaintiffs do not allege that Uber had a contractual obligation to indemnify them. Thus, they can only proceed under a theory of equitable indemnity, which encompasses traditional equitable indemnity and implied contractual indemnity, both of which are "only available when there is a joint legal obligation between the indemnitee [Uber] and indemnitor [Plaintiffs] to the injured party [unknown here]." *Fed. Dep. Ins. Co. v. RPM Mortgage, Inc.*, Case No. 15-cv-5534-EMC, 2018 WL 1335812, at *3 (N.D. Cal. Mar. 15, 2018). Plaintiffs have not shown that they were joint tortfeasors with Uber against a third-party or that they and Uber, pursuant to a joint contract, injured a third-party. *Id.* at *3-5. Indemnification does not apply.

**Fraud:** Plaintiffs allege that Uber fraudulently misrepresented that it had proper operating authority and that it had paid its PUCTRA fees. They do not allege where and when these representations occurred with specificity, as required under Rule 9(b). The only harm they allege are the service fees they paid to Uber, which were deducted from Plaintiffs' earnings from Uber-arranged fares. FAC ¶ 226. Plaintiffs do not allege that they would not have driven for Uber but for the misrepresentations. The deduction of fees in and of itself is not a harm caused by the purported misrepresentation because Plaintiffs' use of the Uber app was conditioned on deduction of the fees. Thus, this claim fails because (i) the misrepresentations are not alleged with specificity under Rule 9(b) and (ii) there is no causal link between the purported misrepresentation

25

1    and Plaintiffs' harm (the deducted service fees).  Plaintiffs do not respond in their opposition or

2    propose an amendment that would cure the deficiency, so the claim is dismissed with prejudice.

3         **UCL:**  For the reasons previously stated, Plaintiffs fail to state a claim under either the

4    "unlawful" or "unfair" prong of the UCL, Cal. Civ. Code § 17200, because they do not plausibly

5    allege that Uber's conduct was otherwise unlawful for violating either the FMCA or California's

6    TCP and TNC regulations.  *See Hodson v. Mars, Inc.*, 891 F.3d 857, 865-66 (9th Cir. 2018) (to be

7    "unfair," conduct must be "tethered to some legislatively declared policy or proof of some actual

8    or threatened impact on competition" (quotation and citation omitted)).  The claim fails under the

9    "fraudulent" prong of the UCL for the same reason Plaintiffs' fraud claim fails.  ]

10         3.    Remaining California Claims

11        Finally, Plaintiffs also bring claims for intentional and negligent interference with

12   contractual relations and prospective economic advantage, and for declarations that their

13   arbitration agreement with Uber is unlawful.

14        **Arbitration:**  Plaintiffs' challenge to the lawfulness of the arbitration agreement is moot.

15   Uber is not seeking to compel arbitration of this dispute.  Moreover, Plaintiffs opted out of the

16   arbitration agreement.  *See* Docket No. 45.  There is no live dispute.  The claim is **DISMISSED**

17   with prejudice**.**

18        **Intentional and negligent interference with contract:**  Plaintiffs' intentional interference

19   claim appears to be based on Uber's interference "with the CPUC Regulatory, contractual

20   relations between Plaintiffs' Overton and Mendel and its employees, clients, and suppliers [sic]."

21   FAC ¶ 205.  The asserted theory is somewhat unintelligible but the Court construes this as

22   claiming that Uber interfered either with Plaintiffs' contractual relations with the CPUC, or with

23   Plaintiffs' clients.  However, the pleadings are vague and conclusory and it is not clear whether a

24   contract even exists, what Uber specifically did to interfere with the contract(s), and whether there

25   has been any harm to Plaintiffs.  Furthermore, there is no such thing as a "negligent interference

26   with contract" claim under California law.  *See Cisco Sys., Inc. v. STMicroelectronics, Inc.*, 77 F.

27   Supp. 3d 887, 899 (N.D. Cal. 2014) ("[I]n California there is no cause of action for negligent

28   interference with contractual relations.").  Plaintiffs have not proposed a cure in their proposed

SAC to these deficiencies.  Accordingly, the claims are **DISMISSED** with prejudice.

**Intentional and negligent interference with prospective economic advantage:**
Similarly, Plaintiffs allege that Uber acted "to induce Plaintiffs' Overton and Mendel existing CPUC Regulators, employees, clients, prospective clients, and suppliers to sever, and the CPUC to suspend Plaintiffs' TCP authority and their present and prospective business relationships with regulators and clients."  FAC ¶¶ 213, 218.  Once again, the underlying theory of interference is unclear.  To the extent Plaintiffs allege that Uber induced the CPUC to temporarily suspend their TCP licenses for failure to pay PUCTRA fees, Plaintiffs do not plausibly allege that Uber played any role whatsoever in the CPUC's enforcement action against Plaintiffs.  To the extent Plaintiffs allege that Uber has interfered with Plaintiffs' relationship with their clients/passengers, they have not specifically pled how that happened.  Plaintiffs have not proposed a cure in their proposed SAC.  Thus, these claims are also **DISMISSED** with prejudice.

4.    <u>Further Amendment Is Not Warranted</u>

Plaintiffs' proposed Second Amended Complaint also includes additional claims under 42 U.S.C. § 1983 against the Uber defendants for violating the commerce clause and 14th Amendment, but the claims would not be viable so amendment is futile.  *See Deutsch v. Turner Corp.*, 324 F.3d 692, 718 (9th Cir. 2003) (district court does not abuse discretion when dismissing a claim without leave to amend where doing so would be futile).  Plaintiffs do not allege that Uber deprived their rights "under color of state law," as required to allege a Section 1983 claim.  *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003).  Private parties are not state actors, except in limited circumstances that do not apply here.  *See, e.g., Brunette v. Humane Soc. of Ventura Cty.*, 294 F.3d 1205, 1210 (9th Cir. 2002) (private party may be deemed to have engaged in state action if it is a willful participant in joint action with the government; if the government has insinuated itself into a position of interdependence with it; and if it performs functions traditionally and exclusively reserved to the states); *Brentwood Acad. v. Tenn. Secondary School Athletic Ass'n*, 531 U.S. 288, 300–301, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (state action may be found where private entity is controlled by an agency of the state, when its activity results from the state's exercise of coercive power, when the state provides encouragement, or when government is

"entwined" in the entity's policies, management, or control).  Uber's mere compliance with the TNC program does not constitute state action.

## IV.     CONCLUSION

For the reasons stated above, Plaintiffs' First Amended Complaint is **DISMISSED** with prejudice.  Leave to amend is **DENIED** because amendment would be futile, as confirmed by Plaintiffs' proposed SAC.

This order disposes of Docket Nos. 51 and 59.  The Clerk shall enter judgment for the Uber Defendants and CPUC Defendants.


**IT IS SO ORDERED**.


Dated: August 8, 2018

_____
EDWARD M. CHEN
United States District Judge